BERZON, Circuit Judge,
concurring in part and dissenting in part:
I concur in Parts I and II.A-C of the panel’s opinion but write separately with regard to Part II.A and respectfully dissent from Part II.D.
I.
The Reed case relied on in Part II.A of the panel’s opinion says the following: “Once a conspiracy is established, only a slight connection to the conspiracy is necessary to support a conviction. The term ‘slight connection’ means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details. A connection to the conspiracy may be inferred from circumstantial evidence. Innocent association, even if it is knowing, does not amount to a ‘slight connection.’ ” United States v. Reed, 575 F.3d 900, 924 (9th Cir.2009) (internal citations, quotation marks, and alterations omitted); see Maj. Op. at 1086. The majority relies on Reed, and, although it slightly paraphrases the language of the opinion, I understand the majority opinion to incorporate Reed’s holding concerning the limited import of the “slight connection” locution. I therefore concur in Part II.A of the opinion.
I nonetheless write separately, to express my concern that some of the quotations in Part II.A could be read, in isolation, to suggest that a defendant may be convicted without in any way participating in a conspiracy, if he simply has knowledge of the conspiracy and a “connection” to its participants. See Maj. Op. at 1086. That, of course, is not the law. See, e.g., United States v. Tran, 568 F.3d 1156, 1164-65 (9th Cir.2009) (reversing a conspiracy conviction because there was no “evidence ... from which it could be inferred — much less proved beyond a reasonable doubt — that [the defendant] participated in the conspiracy in any manner”) (emphasis added).
More than thirty-five years ago, a panel of this court endeavored to provide greater clarity regarding one aspect of the law of conspiracy, and in so doing, emphasized the risk of “proliferat[ing]” “statement[s]” of law that are “highly misleading if taken out of the context of the particular cases in which ... made.” See United States v. Dunn, 564 F.2d 348, 356 (9th Cir.1977).[1] In the process, the court stated that “evidence establishing beyond a reasonable doubt a connection of a defendant with [a] conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy.” Id. at 357 (emphasis added). At the same time, the panel noted that “after much reflection, [it was] of the mind that” that statement of law “may be of doubtful appellate application when the issue for review concerns whether the defendant was connected with the conspiracy at all.” Id. at 357 n. 21. The court quoted with approval a decision of the Fifth Circuit, explaining that this rule “ ‘finds its proper application where persons are clearly connected to the conspiring group or are found acting in such a manner as unmistakably to forward its purposes.’ ” Id. at 357 n. 21 (quot *1097 ing United States v. Alvarez, 548 F.2d 542, 544 (5th Cir.1977)).
Despite the doubts expressed by the Dunn court, in the intervening years, we have “repeatedly proliferated ... th[e] statement” that a defendant may be convicted of “knowing participation in [a] conspiracy” based on evidence of a “slight” “connection” with the conspiracy. See id. at 356-57. As other judges have noted, this is a misleading, or at least ambiguous, standard. It could be read to “mean that once A and B conspire, ... [a] ‘slight connection’ is enough to convict C of the same crime, an intolerable proposition.” See United States v. de Ortiz, 883 F.2d 515, 524 (7th Cir.1989) (Easterbrook, J., concurring), reh’g granted and judgment vacated on other grounds, 897 F.2d 220 (7th Cir.1990). It also could be read to “mean that an appellate court must keep in mind the possibility that evidence may be slight quantitatively although substantial qualitatively — that a single piece of evidence may be enough in context, an unexceptionable proposition.” Id. On the other hand, “[m]ere casual association with conspiring people is not enough,” see United States v. Bautista-Avila, 6 F.3d 1360, 1362 (9th Cir.1993), though on its face, “casual association” certainly sounds like a “slight connection.”
As Judge Easterbrook has observed, the phrase “slight connection” is ultimately best understood to mean that “if someone joins the conspiracy, ‘slight’ activity to accomplish its objectives is enough, that peripheral conspirators commit the crime no less than the mastermind.” See de Ortiz, 883 F.2d at 524. “This interpretation follows the definition of the crime (agreement plus one overt act) and is not troubling. That we have to tease it out of a formula with dubious alternative meanings, though, is a mark against its use.” Id. A panel of the Second Circuit has agreed. See United States v. Huezo, 546 F.3d 174, 184-85 (2d Cir.2008) (Newman, J., concurring, joined by Walker, J., and Sotomayor, J., in relevant part).
Here, there is no doubt that Grasso committed overt acts in furtherance of the conspiracy. As the panel opinion explains, Grasso “assisted his co-conspirators in convincing lenders that various properties were sold for more than their actual sales prices.” Maj. Op. at 1087. He also “personally inflated the MLS listings in the Claridge Drive and Alta Drive transactions.” Maj. Op. at 1087. We therefore have no occasion to consider whether our case law repeating the “slight connection” standard is a useful statement of the law “when the issue for review concerns whether the defendant was connected with the conspiracy at all,” see Dunn, 564 F.2d at 357 n. 21, or whether, instead, the use of the phrase “slight connection” should be abandoned as ambiguous and misleading.
II.
I respectfully dissent from Part II.D. Under our case law, Grasso’s convictions for money laundering cannot stand.
A.
As the majority recognizes, under the statute here applicable, 18 U.S.C. § 1956 (2006), now superseded,[2] a defendant ordinarily could not be charged with both a criminal offense and a separate money laundering offense for the same conduct, when the “very nature of the scheme required ... [the] payment[ ]” that is charged as money laundering. See United States v. Van Alstyne, 584 F.3d 803, 814 (9th Cir.2009). Such double charging— which we have denominated the “merger problem” — was only permissible if the government proved that the payment charged *1098 as money laundering was made with the “profits (as opposed -to gross proceeds)” of the underlying scheme. See United States v. Ali, 620 F.3d 1062, 1072 (9th Cir.2010). To determine whether a money laundering charge triggered the “merger problem,” we “must focus on the concrete details of the particular scheme” underlying the separate criminal charges against the defendant. See Van Alstyne, 584 F.3d at 815 (internal quotation marks omitted).
As is clear from the majority’s own explanation of the intricacies of the scheme in which Grasso was involved, the money laundering counts charged Grasso with conducting payment of “essential expenses of’ the bank fraud with which Grasso was also charged. See United States v. Santos, 553 U.S. 507, 528, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008) (Stevens, J., concurring). The bank fraud count charged Grasso with carrying out a “scheme and artifice to defraud the victim lenders,” including Lehman Brothers, GreenPoint Bank, and RBC Mortgage Company. See 18 U.S.C. § 1344. “[Ijnstrumental to the co-conspirators’ operation” was their use of Cal Title — in which Grasso held an “ownership interest” — “to prepare ... title insurance policies ... with [an] inflated purchase price.” See Maj. Op. at 1082, 1083. The co-conspirators then “provided” the falsified title reports “to the lender[s],” to obtain inflated loans. See id. at 1083. “Although Abrams and Fitzgerald [initially] attempted to use other title companies for their transactions, these companies soon declined to work with them, and Abrams and Fitzgerald began using Cál Title exclusively, whether or not Grasso ... was acting as the agent for the transaction.” See id. Relevant here, Abrams and Fitzgerald used Cal Title to submit lenders with false title reports for the Benedict Canyon and Yoakum Drive transactions.
The money laundering counts, in turn, charged Grasso with successfully demanding that his co-conspirators — Abrams and Fitzgerald — pay him commissions for their use of Cal Title in carrying out the Benedict Canyon and Yoakum Drive transactions. See 18 U.S.C. § 1956(a)(l)(A)(i). Without Cal Title, the scheme could not have generated the false title reports necessary to obtain inflated loans from the defrauded lenders. Grasso “forbade” his co-conspirators from using Cal Title unless they paid him a commission. See Maj. Op. at 1083. “The very nature of the scheme thus required” the co-conspirators to make regular commission payments to Grasso. See Van Alstyne, 584 F.3d at 815.
Nor is it' of any moment that, as the government argues, the payments to Grasso for services provided also “promote[d] future fraud.” The Fourth Circuit recently rejected a similar argument in a case reversing a defendant’s money laundering convictions arising out of an “extensive mortgage fraud conspiracy.” See United States v. Cloud, 680 F.3d 396, 399 (4th Cir.2012). The scheme there at issue “involved convincing people to invest in real estate properties that, unbeknownst to the buyers, Cloud had recently purchased for a lesser amount. The scheme also involved falsification of loan applications.... ” See United States v. Abdulwahab, 715 F.3d 521, 530 (4th Cir.2013) (discussing Cloud, 680 F.3d at 399-400) (internal citation omitted). Cloud “lured his co-conspirators with promises of payment,” including commissions for recruiting buyers to the scheme. See Cloud, 680 F.3d at 405, 407. In response to the government’s contention that the payments were designed only “to perpetuate the scheme,” and therefore constituted promotional money laundering, see 18 U.S.C. § 1956(a)(l)(A)(i), the court emphasized that the payments were also for “services performed,” namely for “past and essen *1099 tial expenses of [the] mortgage fraud conspiracy,” Cloud, 680 F.3d at 407-08.
Indeed, any payment for services already rendered in the context of a fraud scheme also promotes future fraudulent activity by the person paid, by creating an expectation that the person will be paid again. In any case involving ongoing fraud, the government’s approach — which, I note, the majority does not endorse— would obliterate the limitations our cases have set forth regarding the merger problem.
Because the government introduced no evidence that the Benedict- and Yoakumrelated commission payments were made with profits, as opposed to gross revenues, of the overall bank fraud scheme, Grasso’s convictions for money laundering must be reversed. See Van Alstyne, 584 F.3d at 815.
B.
To avoid the straightforward result compelled by our precedents, the majority points to four reasons why the transactions charged as money laundering, despite being necessary to the fraud scheme, supposedly pose no merger problem. None of the majority’s theories works.
1.
First, contrary to the majority’s assertion, the payments to Grasso for the Benedict and Yoakum transactions did not “hinder[ ] the scheme.” See Maj. Op. at 1095. For that dubious proposition, the majority relies on our decision in Van Alstyne, in which we construed a “Ponzi scheme [that] depended on attracting new investments and using some but not all of the amount collected to pay returns to earlier investors.” See Van Alstyne, 584 F.3d at 815. We held that “distribution checks” periodically issued to individual investors pursuant to the scheme were not chargeable as both mail fraud and money laundering. Id. The checks were funded not by any investment returns, “but by the investors’ own principal,” and were issued to cause investors to “believe[] they had invested wisely,” and to encourage them to invest additional funds. See id. at 808-09, 815. Because issuance of the checks was necessary to inspire investor confidence in the Ponzi scheme and to attract additional investment, the distribution checks were “a central component of the scheme to defraud,” and therefore ran squarely into the merger problem. See id. at 815 (internal quotation marks omitted).
With regard to a separate transaction— on which the majority focuses — we held that there was no merger problem. See id. at 815-16. That transaction was a “full[ ] refundf ]” of “one investor’s [initial] outlay,” pursuant to that investor’s demand. See id. at 815. “Returning the entire amount of th[at] ... investment,” we explained, “undermined rather than advanced the core scheme, as the funds returned ... would not be available to lull other investors into maintaining their investment.” Id. at 815-16.
Unlike the full refund in Van Alstyne, Grasso’s commission payments for use of Cal Title were “essential expenses” of the underlying fraudulent scheme. See Santos, 553 U.S. at 528, 128 S.Ct. 2020 (Stevens, J., concurring). As explained, after some time, Cal Title was the only title company that Grasso’s co-conspirators could use to generate the necessary false reports. To use Cal Title, the conspirators had to pay Grasso a commission. Like the periodic distribution payments that presented a merger problem in Van Alstyne, the commission payments to Grasso prevented the scheme from using some amount of funds to expand the scheme even further, but that is always the case when a scheme pays its “essential ” “operating” “expenses,” such as the commis *1100 sions paid to the “runners” who “gathered bets from gamblers” in the lottery scheme in Santos. See id. (emphasis added); id. at 509 (plurality opinion). By construing a necessary payment as somehow undermining the fraud, the majority’s strained analogy to the money laundering count upheld in Van Alstyne threatens to eviscerate Santos’s core holding.
2.
The majority fares no better by contending that the merger problem vanishes because Abrams paid Grasso commissions only for the Benedict and Yoakum transactions, and not for other fraudulent transactions carried out earlier. See Maj. Op. at 1094. Abrams’s commission payments to Grasso were in fact an integral part of each instance of bank fraud once title companies other than Cal Title refused to participate in the conspirators’ scheme.
In support of its pronouncement that the payments to Grasso for services rendered were “irrelevan[t] to the overarching fraudulent] scheme,” Maj. Op. at 1095, the majority relies on a case which, on plain error review, construed eighteen monetary transactions to the defendant’s personal bank account as not “central to carrying out the scheme’s objectively],” United States v. Bush, 626 F.3d 527, 533, 537-38 (9th Cir.2010). Again, “the concrete details of the particular scheme” must be examined to understand the context for the court’s analysis. See Van Alstyne, 584 F.3d at 815 (internal quotation marks omitted).
In Bush, the transactions charged as money laundering were complete before some of the conduct separately charged as fraud was even carried out. See Bush, 626 F.3d at 537-38. There was no merger problem with regard to separate wire-fraud charges — related to a Ponzi scheme — because the “necessity of the transfers ... was limited to Bush’s personal interest in veiling the sources of his income from public authorities.” Id. at 538. The court explained that the transactions were made only after authorities began investigating his business associates; “[r]ather than risk investors sending money directly to his [business] account, Bush deflected attention by steering the investments overseas first.” Id. As the court appropriately recognized, “[t]aking additional steps to hide completed criminal activity is not central to the solicitations necessary for a Ponzi scheme to continue operating.” Id.
Here, Grasso’s demands that his co-conspirators pay him commissions essential to the ongoing fraudulent scheme cannot fairly be analogized to the transactions in Bush. The commissions were not simply payments for participation in the conspiracy but for providing an essential service, once the service was not otherwise obtainable.
3.
Nor is the merger problem mitigated by the fact that the money laundering count exposed Grasso “only” to “an additional 20 years of imprisonment,” beyond the 30-year “statutory maximum for the underlying bank fraud charge.” See Bush, 626 F.3d at 538; Maj. Op. at 1095.
As an initial matter, it is far from clear that under our case law, the extent of the increase in the statutory maximum sentence is a relevant consideration in determining whether the merger problem exists. In Van Alstyne, we noted that the Sixth Circuit held that proceeds “ ‘means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase.’ ” Van Alstyne, 584 F.3d at 814 (quoting *1101 United States v. Kratt, 579 F.3d 558, 562 (6th Cir.2009)) (emphasis added). We nonetheless construed the Santos plurality and concurrence differently from the Sixth Circuit, holding that there was a merger problem based on the defendant’s conviction for both mail fraud and money laundering, without regard to the applicable statutory máximums — 30 years for mail fraud and 20 years for money laundering. See id.; 18 U.S.C. §§ 1341, 1956. Indeed, Van Alstyne nowhere mentioned the statutory maximum for mail fraud in its consideration of the merger problem. The case on which the majority relies, Bush — again decided on plain error review, see 626 F.3d at 533 — followed the Sixth Circuit’s approach, rather than our own.[3]
In any event, the extent of the “additional” sentencing exposure that Grasso “face[dj” as a result of the money laundering charge, see Santos, 553 U.S. at 516, 128 S.Ct. 2020, was identical to what Van Alstyne faced, see Van Alstyne, 584 F.3d at 809 (noting that Van Alstyne was convicted of mail fraud in violation of 18 U.S.C. § 1341); 18 U.S.C. § 1341 (providing a statutory maximum of 30 years). As we are bound by precedents involving “nearly identical facts,” see United States v. Vasquez-Ramos, 531 F.3d 987, 989 (9th Cir.2008) (per curiam), the statutory máximums at issue are simply not a basis for treating Grasso’s case differently than Van Alstyne’s. Nor, were we considering the issue ab initio, could it fairly be said that a 20-year increase of a 30-year sentence is not “radical[j,” see Santos, 553 U.S. at 517, 128 S.Ct. 2020, in the ordinary sense of being “marked by a considerable departure from the usual or traditional,” see Webster’s Collegiate Dictionary 1025 (11th ed.2003) (defining “radical”).
4.
The majority’s final rationale for resisting the merger problem here is that there is ostensibly no such problem when a “money laundering conviction is based on ... transfers to co-conspirators.” See Maj. Op. at 1095. To be sure, some transfers of funds among co-conspirators raise no merger problem. But while some such transfers merely' involve co-conspirators “reaping the fruits of their crimes,” others represent payments of essential expenses of a fraud scheme. See Cloud, 680 F.3d at 406 n. 4. In the latter instance, a merger problem plainly exists.
Again, the Fourth Circuit’s cogent analysis is instructive. In Cloud, several of the money laundering, convictions reversed on appeal involved payments to co-conspirators; “it was only through the promise of these payments that Cloud was able to persuade his co-conspirators to do business with him.” Abdulwahab, 715 F.3d at 531. In so concluding, the Fourth Circuit carefully examined the “nature of the payment” and its relevance to the scheme. Cloud, 680 F.3d at 406 n. 4; accord Van Alstyne, 584 F.3d at 815. The court distinguished the scheme that Cloud perpetuated from the scheme in an earlier case, United States v. Halstead, 634 F.3d 270 (4th Cir.2011), in which co-conspirators orchestrated insurance fraud. The Hal-stead defendants were charged with money laundering only because ill-gotten funds were ultimately transferred to their checking accounts. Cloud, 680 F.3d at 406 n. 4 (citing Halstead, 634 F.3d at 273, 279). In Halstead, the fact that the defendants ultimately paid themselves posed no merger problem, as they “were not paying the expenses of the fraud, but rather were *1102 reaping the fruits of their crimes.” Cloud, 680 F.3d at 406 n. 4.
The majority misconstrues our own case law in concluding that we have foreclosed all Santos-based challenges to money laundering convictions simply because predicated on payments to co-conspirators. In Van Alstyne, for instance, we noted that a “ ‘merger’ problem may ... be triggered when multiple participants share profits.” 584 F.3d at 815. The two cases on which the majority relies — United States v. Webster, 623 F.3d 901 (9th Cir.2010), and United States v. Wilkes, 662 F.3d 524 (9th Cir.2011) — are not to the contrary.
Webster involved a conspiracy to distribute methamphetamine. See Webster, 623 F.3d at 905. Webster argued on appeal that given the' charges for conspiracy to possess with intent to distribute methamphetamine, 21 U.S.C. § 846, and possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), Santos barred an additional charge for money laundering, without proof that the “proceeds” involved in the relevant transactions represented “profits.” Webster, 623 F.3d at 905. Webster did not specify the transactions that gave rise to the money laundering charge, and nothing in the opinion indicates that the charge was for transactions involving “essential expenses” of the underlying drug conspiracy. See Santos, 553 U.S. at 528, 128 S.Ct. 2020 (Stevens, J., concurring).[4] We rejected Webster’s challenge to his money laundering conviction, explaining that under the relevant statutes, the drug crimes with which Webster was charged “need not involve the exchange of money”; there was accordingly no merger problem. See Webster, 623 F.3d at 906. We also noted that Justice Stevens’s concurrence in Santos took the position that the legislative history of the money laundering statute, 18 U.S.C. § 1956, indicated that no merger problem exists in the particular case in which a money laundering charge is based on a transaction involving “ ‘gross revenues from the sale of contraband and the operation of ■ organized crime syndicates involving such sales.’ ” Id. (quoting Santos, 553 U.S. at 526, 128 S.Ct. 2020 (Stevens, J., concurring)). Because the four dissenting Justices in Santos agreed with Justice Stevens in that regard, see Santos, 553 U.S. at 531-32, 128 S.Ct. 2020 (Alito, J., dissenting), we concluded that a majority of the Supreme Court had held that no merger problem existed where “a money laundering count is based on transfers among co-conspirators of money from the sale of drugs.” Webster, 623 F.3d at 906. As the majority recognizes, see Maj. Op. at 1093, Webster alone does not stand for the broad proposition that payments to co-conspirators more generally present no merger problem.
Turning to Wilkes, the defendant was charged with honest services wire fraud, bribery, and money laundering, in connection with a scheme to bribe a member of Congress, Randall “Duke” Cunningham. See 662 F.3d at 530. Cunningham secured “millions of dollars in appropriations for ... [the] benefit” of Wilkes and another co-conspirator. Id. at 531. “[T]hrough a complicated series of financial transactions among multiple companies, Wilkes paid off $525,000 on Cunningham’s second mortgage.” Id. Wilkes was charged with money laundering for making a wire transfer in the course of those transactions. On appeal, Wilkes argued that the wire transfer at issue was “merely an expense associated with the bribery, and, thus, not ‘proceeds.’ ” Id. at 549. Wilkes explained that *1103 unlike the defendant in Santos, who was charged with promotional money laundering, Wilkes was charged with concealment money laundering. Id. Rather than using funds associated with the bribery scheme to remit payment directly to Cunningham, “Wilkes transferred the $525,000” from one of his companies, to “another of his accounts, WBR Equities.” Id. at 547. The panel emphasized the measures that Wilkes took to disguise the source of the funds:
Wilkes could have sent the $525,000 from WBR Equities to Cunningham or Coastal Capital directly. Again, he did not. Instead, he wired $525,000 from WBR Equities to Parkview Financial, Inc. In the meantime, Parkview Financial and Coastal had engaged in a series of transactions of their own, which provided additional buffers between the corrupt contract and the payoff of Cunningham’s mortgage. Concealing this connection appears to be the dominant, if not the only, purpose of these multilayered transactions.
Id. Because of the extensive steps Wilkes took to conceal the source of the funds, Wilkes’s conduct was separately chargeable as concealment money laundering, rather than just as a transaction “that involve[d] nothing but the initial crime,” namely bribery. See id. at 547, 549. No merger problem therefore existed.
Wilkes also noted that as in “Webster, Wilkes’s money laundering count was based on a transfer to a co-conspirator of money” from a scheme “such that ‘proceeds’ would include all ‘receipts’ from” that scheme. See id. at 549. But the opinion contained no analysis in support of that conclusion. See id. Unlike the majority, I do not read Wilkes for the expansive proposition that whenever a “transfer to a co-conspirator” occurred, there could, ipso facto, be no merger problem.
First, as a three judge panel, absent intervening controlling authority — of which there has been none — Wilkes could not have overruled Van Alstyne, in which we noted that a “ ‘merger’ problem may ... be triggered when multiple participants share profits.” 584 F.3d at 815; see Miller v. Gammie, 335 F.3d 889, 900 (9th Cir.2003) (en banc). Second, as noted, Wilkes expressly rejected the defendant’s characterization of the “multi-layered transactions” as essential elements of the overall bribery scheme. Wilkes, 662 F.3d at 547. Instead, the court held that the wire transfers were “additional act[s]” separately chargeable as concealment money laundering. Id. at 547, 549. The majority’s broader reading of Wilkes is foreclosed by the fact that unlike in Grasso’s case, Wilkes involved no payments “necessary” to the scheme.[5] See Van Alstyne, 584 F.3d at 815.
In short, neither Webster nor Wilkes— individually or collectively — can sustain the weight that the majority places on them. Neither case dealt with a payment to a co-conspirator involving essential expenses of the underlying scheme. Webster was, in the Fourth Circuit’s useful parlance, a case in which the defendant merely “reap[ed] the fruits of [his] crimes.” See Cloud, 680 F.3d at 406 n. 4. Wilkes involved a money laundering charge that did not merge with the bribery count because it was separately chargeable as concealment money laundering. See Wilkes, 584 F.3d at 815.
C.
Only by reading a series of heretofore nonexistent rules into our case law does the majority avoid the conclusion that *1104 Grasso’s money laundering convictions are barred by Santos and its progeny. Because a proper analysis of “the concrete details of the particular scheme” with which Grasso was charged reveals that the additional money laundering charges pose an unequivocal merger problem, I would reverse Grasso’s money laundering convictions. See Van Alstyne, 584 F.3d at 815 (internal quotation marks omitted).

. In Dunn, the government argued that " '[o]nce the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it,’ quoting from United States v. Knight, 416 F.2d 1181, 1184 (9th Cir.1969).” Id. at 356 (some intemal quotation marks omitted). We observed that the quoted statement from Knight "obviously was [not] intended to state ... the law regarding evidence,” id., and clarified that the evidence must be ”establish[ed] beyond a reasonable doubt,” id. at 357.

. See 18 U.S.C. § 1956(c)(9) (2009).

. United States v. Phillips, 704 F.3d 754 (9th Cir.2012), also cited by the majority, also reviewed a money laundering conviction only for plain error, id. at 762, and followed Bush, rather than Van Alstyne, in assessing the relevance of the increase in the defendant’s sentence, see id. at 766 n. 11.

. My review of Webster’s briefs on appeal, and his letter pursuant to Rule 28(j) in which he initially raised the merger argument, confirms that Webster never argued that the transactions were for expenses necessary to consummate the charged drug crimes.

. Notably, the government has not defended Grasso’s money laundering convictions on the ground that they were "additional acts” separately chargeable as concealment money laundering.