PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RONALD L. HALSTEAD,

*Defendant-Appellant.*

No. 09-7442

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, District Judge.
(1:01-cr-00045-IMK-JSK-4; 1:08-cv-00135-IMK-JSK)

Argued: December 7, 2010

Decided: March 7, 2011

Before NIEMEYER, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge King and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Richard Aaron Jaffe, Houston, Texas, for Appellant. Daniel Steven Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, Patrick M. Donley, Fraud Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Betsy Jividen, Acting United States Attorney, Wheeling, West Virginia, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

Ronald Halstead was convicted of both healthcare fraud under 18 U.S.C. § 1347 and conspiracy to launder monetary instruments under 18 U.S.C. § 1956 and sentenced to 151 months' imprisonment. After unsuccessful appeals, he filed this petition for collateral review under 28 U.S.C. § 2255 to vacate his money laundering conviction on the ground that the evidence was insufficient to support convictions of two distinct crimes. He claims that the transactions supporting his money laundering conviction were the same transactions supporting his healthcare fraud conviction, leading to a "merger problem." He argues that the only way the government could have avoided "merger" of the two crimes would have been to prove that he laundered the "net profits," not the "gross receipts," of the healthcare fraud, which the government did not do. In making this claim, Halstead relies on the Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008), which was decided after his convictions and which, he argues, should be applied retroactively on collateral review.

In *Santos*, the Court held that, in order to avoid a merger of the crimes of money laundering and operating an illegal

gambling business, the term "proceeds" in the money laundering statute must be construed to mean "net profits," not "gross receipts," of the illegal gambling business.

While we agree with Halstead that *Santos* does apply retroactively on collateral review, we conclude that it does not warrant relief in this case where the laundering of proceeds from the healthcare fraud involved transactions distinct from and subsequent to the transactions involved in the healthcare fraud itself. We read *Santos* to require a restricted interpretation of "proceeds" only when a broader interpretation would risk a "merger" of a money laundering crime and a crime for operating an illegal gambling business. In this case, however, regardless of whether "proceeds" is defined as "gross receipts" or "net profits," a merger problem does not occur, because Halstead's commission of healthcare fraud was complete before he committed money laundering. Accordingly, we affirm.

I

Ronald Halstead, a trained chiropractor, had been a consultant to chiropractic and medical practices since 1982 through his corporation, Management One Systems, Inc., doing business as Practice Systems. In late 1993, Halstead advised Robert Burns, a chiropractor in Morgantown, West Virginia, how Burns could increase his income by performing more reimbursable tests per patient visit by linking his chiropractic practice with a medical practice and marketing the joint practice in a specified manner. Under Halstead's direction, Burns formed a parent company, West Virginia Healthcare Management, to own two subsidiary corporations, one a chiropractic clinic known as Mountaineer Chiropractic Center and the other a medical clinic known as Priority One Medical Associates. He had Burns retain Dr. Amando Medina as a doctor to staff the Priority One Medical Association, naming him also as the nominal owner of the corporation. Dr. Medina, however, performed scant medical work, as he was retained

mostly to prescribe chiropractic services so that those services would be covered by the patients' healthcare benefits.

Halstead also hired a marketing specialist to generate increased traffic through the combined medical and chiropractic clinics. The marketer implemented a program where the clinic held marketing dinners, which were free for anyone who filled out a form listing an employer who provided health insurance benefits. At these dinners, the clinic would give out certificates for free examinations and x-rays.

To capitalize on the patient traffic thus generated, Halstead implemented a procedure for the clinic's chiropractors to follow when seeing new patients, providing an exact script for this purpose. The chiropractors were instructed to apply pressure to joints and ask the patient if he or she "noticed any pain or discomfort." After applying pressure, the chiropractor was supposed to tell the patient, "I think you'll agree with me that we have a serious problem here . . . ." Under the script, the chiropractor was then instructed to take two x-rays of the patient and to show the x-rays to the patient, informing the patient that, "[t]hese vertebrae are severely twisted out of position." Finally, the chiropractor was directed to tell the patient that 20 to 30 visits were required to correct the problem. If the patient hesitated, the chiropractor was instructed to say, verbatim: "As you remember those vertebrae are severely twisted out of position. I hate to see you leave here today not making a commitment to getting the treatment you know you need, and I know you need." To make sure that the examination script was being followed, Halstead taped some of the chiropractic exams, listened to them, and reviewed them with the chiropractors to point out discrepancies between the script and the actual examination.

To take advantage of the patients' healthcare benefits, which often required that a medical doctor order and supervise specified chiropractic services, Halstead and Burns adopted two courses of action. First, they had the medical cor-

poration, Priority One, do all the billing of insurance companies and other healthcare providers, regardless of whether the patients' visits were chiropractic or medical in nature. Second, Halstead advised Burns to require Dr. Medina to focus on authorizing chiropractic treatments. While Dr. Medina thus became these patients' physician, it was in name only, as he actually acted mostly as a rubber stamp for the chiropractors' requests. Often, Dr. Medina would go through stacks of treatment sheets, signing each one without a clear idea of what treatments he was approving or whether they were necessary.

The clinic also employed a second doctor, Dr. Rebecca Price, with the hope that she too would sign off on these chiropractic treatment forms. Dr. Price, however, refused to participate in this fashion, and when the practice forged her signature on documents submitted to insurance companies and other healthcare providers, she resigned.

Halstead and Burns also orchestrated the cash flow thus obtained from the insurance companies and healthcare providers. All billings to them were conducted by Priority One, the medical subsidiary, and the payments received were deposited into Priority One's checking account. Priority One then transferred these funds to the management company, West Virginia Healthcare Management, which had purportedly been created to provide management services for Priority One. West Virginia Healthcare Management then transferred the money to Halstead and Burns' checking accounts. With respect to Halstead, the money was paid to the checking account of his company, Practice Systems.

During the course of the conspiracy, Priority One billed insurance companies and healthcare providers approximately $5.78 million and received something less than that amount. While some of the amounts received were attributable to legitimate chiropractic services, the Probation Officer in this case determined, for purposes of sentencing, that approxi-

mately $1.287 million of the amounts received were from fraudulent billing.

Halstead and his co-conspirators were indicted in September 2001, and Halstead was subsequently convicted of one count of conspiracy to commit mail fraud and healthcare fraud, in violation of 18 U.S.C. § 371; 14 counts of healthcare fraud, in violation of 18 U.S.C. § 1347; and one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). The district court sentenced him to 121 months' imprisonment, entering judgment on July 1, 2004.

On appeal, Halstead's convictions were affirmed, but his sentence was vacated and the case remanded for resentencing in light of *United States v. Booker*, 543 U.S. 220 (2005). *United States v. Filcheck*, 165 Fed. Appx. 284 (4th Cir. 2006). On remand, the district court, applying the advisory Guidelines range, sentenced Halstead to 151 months' imprisonment, and we affirmed. *See United States v. Halstead*, 261 Fed. Appx. 472 (4th Cir. 2008).

Following Halstead's convictions, the Supreme Court handed down its decision in *United States v. Santos*, 553 U.S. 507 (2008), holding that, in order to avoid a "merger problem," the term "proceeds" in the money laundering statute must be construed to mean "net profits" when the proceeds are derived from an illegal gambling business. Based on that decision, Halstead filed this motion under 28 U.S.C. § 2255, contending that his conviction for money laundering should be dismissed because a merger problem existed and the evidence at trial was insufficient to prove that the "proceeds" from his healthcare fraud were "net profits," rather than "gross receipts."

The district court denied Halstead's motion. It assumed, without deciding, that *Santos* applied retroactively but concluded that *Santos* did not apply to Halstead, based on our unpublished decision in *United States v. Howard*, 309 Fed.

Appx. 760 (4th Cir.), *cert. denied*, 130 S. Ct. 62 (2009). In *Howard*, we concluded that the term "proceeds" in the money laundering statutes generally means "receipts," not "profits," and that *Santos* applied only to money laundering cases in which the predicate offense was illegal gambling.

The district court granted Halstead's application for a certificate of appealability, noting that courts are split on the correct reading of *Santos*, and, by order dated May 4, 2010, we expanded the certificate of appealability to address "whether *Santos* applies retroactively to cases on collateral review," noting that the resolution of that question could preempt the issue for which the district court granted a certificate of appealability.

## II

When *Santos* was decided, Halstead's convictions were final. Nonetheless, Halstead contends that *Santos* should be retroactively applied on collateral review to his money laundering conviction under 18 U.S.C. § 1956 because it effected a substantial change in the law, narrowing the reach of the money laundering statute. In *Santos*, the defendants were convicted of both conducting an illegal gambling business and of laundering the proceeds of that business. To avoid a merger of the two crimes, the Supreme Court held that "proceeds" in the money laundering statute meant the "net profits," rather than the "gross receipts," of the illegal gambling business. In doing so, the Court narrowed the scope of the money laundering statute.

The government concedes that *Santos* applies retroactively to cases on collateral review, and we agree.

When the Supreme Court issues new rulings in criminal cases, substantive rules generally apply retroactively, while procedural rules do not. *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004). "A rule is substantive rather than procedural if it

alters the range of conduct or the class of persons that the law punishes," *id.* at 353, and "rules" include "decisions that narrow the scope of a criminal statute by interpreting its terms," *id.* at 351.

In *Santos*, the Court did narrow the scope of the money laundering statute by interpreting the term "proceeds" in § 1956(a)(1) to mean the "net profits" of an illegal gambling business rather than its "gross receipts." Accordingly, we hold that *Santos* applies retroactively on collateral review.

III

Applying *Santos*, Halstead contends that there is a potential merger of the money laundering crime and the predicate crime in this case, healthcare fraud, in the sense that the same transactions could support convictions for both crimes. He thus claims that *Santos* requires that the money laundering statute be construed narrowly so as to apply only to the "net profits" of the predicate crime and thereby avoid the potential merger of the two crimes. Halstead asserts that because the government did not prosecute the money laundering statute in his case narrowly, as required by *Santos*, his money laundering crime merged with the healthcare crime, requiring that the money laundering conviction be vacated. As he argues, "[T]he same basic facts . . . in the health fraud part of the indictment were repeated as the facts . . . of the money laundering part of the indictment. . . . The indictment simply unbundled the [criminal conduct in this case] into legally separate components . . . . This overlap gives rise to the merger problem which was discussed [in *Santos*]." He asserts that if his money laundering count is not dismissed, he will be punished unfairly with a longer sentence than that which would otherwise be imposed for violating only the healthcare fraud statute.

The government contends that Halstead reads *Santos* too broadly. It argues that *Santos* applies only to money launder-

ing cases in which the predicate crime is illegal gambling. The government urges that we adhere to our earlier holdings that the term "proceeds" in the money laundering statute refers to "gross receipts," rather than simply "profits." *See, e.g.*, *United States v. Singh*, 518 F.3d 236, 247-48 (4th Cir. 2008). It argues that *Santos* created an exception to this general rule, and thus, only in cases where the predicate offense is illegal gambling should we read "proceeds" to mean "net profits." While the government acknowledges that it could prosecute a defendant for both illegal gambling and money laundering only if it could prove that the defendant laundered "net profits" of the illegal gambling business, not its "gross receipts," it asserts that it can prosecute a defendant for laundering "gross receipts" from other underlying illegal activities.

Because *Santos* was decided by a 4-1-4 vote, its holding has been the subject of much debate. This court has not, however, addressed this question in a published opinion.

In *Santos*, the government proved that defendants Santos, Diaz, and others operated an illegal gambling business and that Santos' runners "gathered bets from gamblers, kept a portion of the bets (between 15% and 25%) as their commissions, and delivered the rest to Santos's collectors. Collectors, one of whom was respondent Diaz, then delivered the money to Santos, who used some of it to pay the salaries of collectors (including Diaz) and to pay the winners." *Santos*, 553 U.S. at 509. On these facts, the government obtained convictions of Santos and Diaz for running an illegal gambling business, as well as for money laundering.

A four-Justice plurality comprised of Justices Scalia, Souter, Thomas, and Ginsburg announced the judgment of the Court and joined the plurality opinion written by Justice Scalia. Recognizing that the money laundering statute at its core prohibits *financial transactions* involving "*the proceeds* of specified unlawful activity . . . with the intent to promote

the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(1) (emphasis added), the plurality observed that, if "proceeds" meant "gross receipts," "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would 'merge' with the money-laundering statute." *Santos*, 553 U.S. at 515-16 (plurality opinion). This scenario, the plurality wrote, gave rise to a "merger problem." *Id.* at 516. Justice Stevens, writing separately and concurring in the judgment only, agreed. *See id.* at 524 (Stevens, J., concurring). Thus, because the defendants were tried for laundering "gross receipts" of the illegal gambling business, a five-justice majority held that their money laundering convictions had to be vacated.

Although the plurality and Justice Stevens reached the same result, they were not in complete accord as to the reasons for reaching it. For its part, the plurality found that the term "proceeds" in 18 U.S.C. § 1956(a)(1) was ambiguous because proceeds can mean either "gross receipts" or "net profits," and neither the statute nor statutory context gave an indication as to which meaning was more appropriate. 553 U.S. at 513 (plurality opinion). The plurality thus invoked the rule of lenity and concluded that "proceeds" should always be defined as "profits" because that definition is "always more defendant-friendly." *Id.* at 514.

Justice Stevens, on the other hand, began by evaluating the money laundering statute's legislative history for clues as to the proper interpretation of "proceeds." *Santos*, 553 U.S. at 525-26 (Stevens, J., concurring). Since this analysis yielded no definitive answer, Justice Stevens determined that Congress could have defined the term "proceeds" differently when applied to different predicate offenses. As he stated, "[T]his Court need not pick a single definition of 'proceeds' applica-

ble to every unlawful activity, no matter how incongruous some applications may be." *Id.* at 525. He thus focused on the definition of "proceeds" when the unlawful activity was illegal gambling and found that "[t]he consequences of applying a 'gross receipts' definition of 'proceeds' to the gambling operation conducted by respondents are so perverse that I cannot believe they were contemplated by Congress." *Id.* at 526. What he found to be perverse was essentially the effect of the "merger problem" coupled with differential sentences for the two crimes. As he explained:

> Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business. A money laundering conviction increases the statutory maximum from 5 to 20 years, and the Sentencing Commission has prescribed different Guidelines ranges for the two crimes.

*Id.* at 527. Resting on that rationale, Justice Stevens announced his holding, allowing him to join in the judgment:

> The revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not "proceeds" within the meaning of the money laundering statute.

*Id.* at 528.

In rejecting the plurality's rationale, Justice Stevens objected to the plurality's application of the rule of lenity to restrict for all cases the definition of the ambiguous term "proceeds." Rather than arriving at a universal interpretation of the term "proceeds" through the rule of lenity, Justice Ste-

vens rested his holding, as he stated, on "my conviction that Congress could not have intended the perverse result that the dissent's rule would produce if its definition of 'proceeds' were applied to the operation of an unlicensed gambling business." *Santos*, 553 U.S. at 528 n.7. To the extent that Justice Stevens' holding sought to avoid the perversity of results in the circumstance where the term "proceeds" was not defined narrowly, he acknowledged that the rule of lenity might "weigh in [that] determination." *Id.* at 528.

The scope of the Court's holding in *Santos*, in which no opinion attracted a majority, has led to a division among the courts of appeals. There are perhaps three groups into which the courts of appeals' decisions might be placed. One group has concluded that the five justices in the *Santos* majority agreed that the term "proceeds" means "net profits" only in the context of an illegal gambling activity. *See United States v. Spencer*, 592 F.3d 866, 879 (8th Cir. 2010); *United States v. Howard*, 309 Fed. Appx. 760 (4th Cir.) (unpublished), *cert. denied*, 130 S. Ct. 62 (2009); *see also United States v. Demarest*, 570 F.3d 1232, 1241-42 (11th Cir.), *cert. denied*, 130 S. Ct. 421 (2009) (holding that it was not plain error to limit *Santos* to illegal gambling cases); *United States v. Bueno*, 585 F.3d 847, 850 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 2359 (2010) (same). Another group has noted that both the plurality and Justice Stevens were concerned that the same underlying transactions could support a violation of both the predicate offense and money laundering, the so-called "merger problem." Therefore, these courts have concluded that whenever a predicate offense presents a merger problem, the term "proceeds" should be defined as "net profits," and that when no merger problem exists, the term "proceeds" should be defined as "gross receipts." *See United States v. Van Alstyne*, 584 F.3d 803, 814 (9th Cir. 2009); *United States v. Lee*, 558 F.3d 638, 642-43 (7th Cir. 2009); *see also United States v. Bucci*, 582 F.3d 108, 123-24 (1st Cir. 2009) (suggesting in dicta that it finds this interpretation of *Santos* persuasive). Finally, several courts of appeals have acknowledged the merger problem but

have also emphasized the fact that Justice Stevens relied on the absence of legislative history to conclude that proceeds from an illegal gambling business should mean net profits. These courts have concluded that "proceeds," as used in the money laundering statute, means "gross receipts" unless there is either a merger problem or the money laundering statute's legislative history indicates that the "net profits" definition is appropriate for the specific predicate offense. *See Garland v. Roy*, 615 F.3d 391, 401-02 (5th Cir. 2010) (holding that courts must look to both the merger problem and legislative history); *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009) (holding that courts must look to both legislative history and merger, but specifying that there is only a merger problem when it "leads to a radical increase in the statutory maximum sentence"); *see also United States v. Yusuf*, 536 F.3d 178, 186 n.12 (3d Cir. 2008) (holding that Justice Stevens' concurrence rested on the narrow grounds that proceeds means net profits when there is no legislative history to the contrary).

The standard for finding the holding of a divided Court in which no opinion attracted a majority, such as was the case in *Santos*, is addressed in *Marks v. United States*, 430 U.S. 188 (1977), where the Supreme Court stated, "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). In *Marks*, the Court attempted to determine the binding effect of *Memoirs v. Massachusetts*, 383 U.S. 413 (1966), where three justices wrote for the plurality holding that the book at issue was not obscenity and therefore was entitled to constitutional protection, while two members concurred in that judgment on the grounds that the First Amendment provided an absolute shield against governmental action suppressing obscenity. The Court concluded that the plurality's position constituted the holding of the Court because it

was a narrower holding than the holding of the concurring two members. *Marks*, 430 U.S. at 193-94.

The holding of *Santos* must thus be distilled by looking to the holdings of the component opinions. The plurality opinion concluded (1) that the term "proceeds" was ambiguous; (2) that interpreting "proceeds" in the money laundering statute to mean "gross receipts" of an illegal gambling operation created a merger problem; (3) that the rule of lenity required a narrow interpretation of "proceeds" to avoid the merger problem; and (4) that for all cases, therefore, "proceeds" as used in the money laundering statute means "net profits." Justice Stevens' opinion concluded (1) that the term "proceeds" was ambiguous; (2) that the legislative history did not provide the term's meaning in the context of illegal gambling and that Congress could have defined proceeds differently for different predicate offenses; (3) that the ambiguity should not be resolved generally by applying a rule of lenity, but rather should be resolved on a case-by-case approach; (4) that interpreting proceeds in the money laundering statute to mean gross receipts in connection with illegal gambling created a merger problem with a perverse result because of the heavier penalty imposed by the money laundering for an offense that was no more than illegal gambling; and (5) that in the context of illegal gambling, proceeds means "net profits."

In its narrowest sense, therefore, the five justices could be found to have held that the money laundering term "proceeds" means "net profits" when the proceeds are from an illegal gambling operation. They also agreed that the driving force for their holding was the merger problem resulting from the circumstances in that case—a prosecution of defendants for transactions that supported convictions for both illegal gambling and money laundering. Finally, they agreed that the merger problem had to be solved by defining the term "proceeds" in the money laundering statute to mean "net profits," because if "proceeds" were defined to mean "gross receipts," any crime involving costs would automatically become

money laundering when the money received from the crime was used to pay expenses. Justice Scalia, speaking for the plurality, explained this:

> For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds—for example, the felon who uses the stolen money to pay for the rented getaway car—would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering.

*Santos*, 553 U.S. at 516 (plurality opinion). And Justice Stevens provided a similar explanation:

> Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy . . . .

*Id.* at 527 (Stevens, J., concurring).

As noted above, however, the plurality and Justice Stevens disagreed on the proper scope of the remedy to the merger problem. The plurality argued that, *in all cases*, "proceeds" should be defined as "net profits," due to the possibility of a merger problem in some cases. Justice Stevens explicitly dissented from this portion of the plurality's opinion. Justice Ste-

vens believed that "proceeds" should be defined as "net profits" when the predicate offense is illegal gambling. In cases with other predicate offenses, Justice Stevens believed that the meaning of "proceeds" should be defined on a case-by-case basis.

Obviously, if the circumstances of *Santos* were now to arise before a court of appeals—where the defendant was prosecuted for money laundering and illegal gambling—the money laundering statute would be construed *to require* a transaction involving the "net profits" of the gambling enterprise. But if the merger problem were now to arise before a court of appeals in a case where money laundering was charged along with some other predicate offense, it is not clear that the holding in *Santos* would require that "proceeds" be defined as "net profits." Justice Stevens clearly stated that his vote was limited to the circumstances of the case before the Court and that *in other circumstances*, he would review the issue again, which would include a review of the legislative history. *See Santos*, 553 U.S. at 525 (Stevens, J., concurring) ("[T]his Court need not pick a single definition of 'proceeds' applicable to every unlawful activity, no matter how incongruous some applications may be"). Thus, when presented with some other predicate offense, a court of appeals would not be *required* to conclude that "proceeds" means "net profits" based on *Santos*. Nonetheless, a court of appeals presented with such a case would certainly be wise to harken to *Santos* and determine whether its approach suggested the proper outcome for that case with a different predicate crime. What does remain clear from *Santos* is that when a merger problem arises, a judicial solution must be found to eliminate its unfairness.

In sum, we read *Santos* to hold that when a merger problem arises in the context of money laundering and illegal gambling, the *required* solution is to define the proceeds of the illegal gambling business as its net profits. When, however, a merger problem arises in the context of money laundering

and an illegal activity other than illegal gambling, because of Justice Stevens' opinion that would require addressing that situation on a case-by-case approach, we will leave further development of a solution to a future case that presents the problem. As we demonstrate below, the merger problem does not arise in this case, and we need not address the appropriate solution to a case involving money laundering and healthcare fraud.

IV

The money laundering statute of which Halstead was convicted criminalizes "financial transactions" when, among other things, they involve the transfer of money that is the "proceeds" of an illegal activity. *See* 18 U.S.C. § 1956(a), (h). Thus, when the illegal activity includes money transactions to pay for the costs of the illegal activity, a merger problem can occur if the government uses those transactions also to prosecute the defendant for money laundering. An individual cannot be convicted of money laundering for paying the "essential expenses of operating" the underlying crime. *Santos*, 553 U.S. at 528 (Stevens, J., concurring). But when the financial transactions of the predicate offense are different from the transactions prosecuted as money laundering, the merger problem recognized in *Santos* does not even arise. That is the case here.

In this case, Halstead complains that the transactions of his healthcare fraud conviction and his money laundering conviction were the same, raising the merger problem. He states in his brief:

> The basis of the money laundering was that Halstead helped set up all the business structures, interrelationships and flow of monies from the various corporate entities engaged in the health care fraud, and that he knew that the fees he received or money paid to Burns were proceeds of the healthcare fraud.

> However, the same basic facts, "manner of means" and "overt acts" in the health fraud part of the indictment were repeated as facts, "manner and means" and "overt acts" of the money laundering part of the indictment.

> Basically the health care fraud was perpetrated through the formation of a medical corporation [Priority One] nominally owned by a medical doctor, and a management corporation [West Virginia Medical Corporation] owned by the chiropractor, Robert Burns.

While he recognizes that the healthcare fraud charges "focus on the billing [of] insurance companies, while the money laundering charge focuses on the transfers [of] money between the two entities," he seeks to derive comfort from the fact that both crimes were the product of a *single conspiracy*, implying that a conspiracy can involve only the commission of one crime. But this is not the way he was charged nor was it the way he was convicted. While Halstead entered into a single agreement with Burns and others for the purpose of fraudulently obtaining funds from insurance companies and healthcare providers, they agreed to commit several crimes including healthcare fraud, mail fraud, and money laundering. Entering into a single agreement to commit numerous crimes does not insulate the conspirators from liability for the crimes that they thereafter commit in furtherance of their agreement.

In this case, Halstead committed healthcare fraud when he directed Priority One to submit fraudulent claims to healthcare providers and those companies paid those claims; Priority One "obtain[ed] by false or fraudulent pretenses . . . money or property owned by . . . a health care benefit program." 18 U.S.C. § 1347(2). At the moment that the healthcare provider paid money to Priority One, the crime of healthcare fraud was complete, and the money that the health-

care provider paid to Priority One was the "proceeds" of the healthcare fraud.

After Priority One fraudulently obtained money from the healthcare providers, Halstead directed that the money be transferred from Priority One to West Virginia Medical Corporation, a company created to manage Priority One. He also directed that the money be further transferred from West Virginia Medical Corporation to Burns and himself, in his case through his company, Practice Systems. These transfers constituted the "transactions" of money laundering, in violation of 18 U.S.C. § 1956(a). Halstead conducted a financial transaction with money he knew was the result of healthcare fraud, and he had the intent to further an unlawful activity when making those transfers, one category of transfers from Priority One to West Virginia Medical Corporation and another from West Virginia Medical Corporation to his own corporation's bank accounts. Moreover, both the transfers to the management company and the transfers to Halstead's company were separate from the transactions constituting healthcare fraud. The healthcare fraud charges were defined by the obtaining of money from the fraudulent billing of healthcare providers, while the money laundering charge was defined by transferring the proceeds thereafter.

Thus, the merger problem never arises in the circumstances of this case, and *Santos* provides Halstead no relief.

Halstead argues that our holding will lead to finding every individual who commits healthcare fraud also guilty of money laundering because everyone will eventually transfer the proceeds of a healthcare fraud scheme into his own account. This argument, however, is nothing more than a disagreement with the definition of federal crimes. While healthcare fraud constitutes one crime, money laundering constitutes a distinct crime, and in this case the transactions involved for each are not the same.

Accordingly, the judgment of the district court denying Halstead's motion under 28 U.S.C. § 2255 is

*AFFIRMED*.