PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ADLEY H. ABDULWAHAB,

*Defendant-Appellant.*

No. 11-5093

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, Senior District Judge.
(3:10-cr-00248-REP-2)

Argued: January 29, 2013

Decided: April 29, 2013

Before TRAXLER, Chief Judge, and GREGORY and
SHEDD, Circuit Judges.

---

Affirmed in part, reversed in part, vacated in part, and
remanded by published opinion. Chief Judge Traxler wrote
the opinion, in which Judge Gregory and Judge Shedd joined.

---

## COUNSEL

**ARGUED:** William Joseph Gonyea, Jr., GONYEA, PLLC, Houston, Texas, for Appellant. Jessica Aber Brumberg, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** James Madison Ardoin III, ARDOINLAW, PLLC, Houston, Texas, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Michael S. Dry, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia; Lanny A. Breuer, Assistant Attorney General, Criminal Division, Albert B. Stieglitz, Jr., Trial Attorney, Fraud Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

TRAXLER, Chief Judge:

Adley H. Abdulwahab appeals his convictions and sentence for several crimes relating to an investment scheme that resulted in nearly $100 million in losses for investors. We reverse Abdulwahab's convictions for money laundering but affirm the remainder of his convictions. Because we reverse the money laundering convictions, we vacate his sentence and remand for resentencing.

### I.

Christian M. Allmendinger and Brent Oncale founded a company known as "A&O" in Houston, Texas, in late 2004. The company sold life settlement investments, which are interests in life insurance policies. Until the end of 2006, A&O sold "bonded life settlements," which were interests in particular life insurance policies. The investments were for

fixed terms of between four and seven years. If the insured died during the term, the life insurance company would pay a benefit, but if the insured remained alive, a reinsurance bond, which A&O purchased from Provident Capital Indemnity ("PCI"), was designed to pay out and take over the life insurance policy (so long as the life insurance policy premiums were current).

Allmendinger and Oncale marketed and sold A&O's bonded life settlements directly to investors, and in early 2005, they hired Abdulwahab to market and sell their products. At the time, Abdulwahab was selling a different product for a different company, BHC Marketing. BHC soon terminated Abdulwahab, however, and he began working full-time as A&O's "national accounts director." J.A. 116. Abdulwahab owned and operated Houston Investment Center ("HIC"), a Texas company that served as A&O's marketing arm. Through HIC, Abdulwahab employed mid-level sales managers who, in turn, supervised independent A&O sales agents around the country. A&O paid HIC its first commission on May 26, 2005.

In marketing A&O's products, both orally and through written materials they created, Allmendinger, Oncale, and Abdulwahab lied about many critical facts. For example, they represented that investor funds were placed in a segregated account dedicated to those payments and used right away to pay policy premiums up front. In reality, A&O had no separate account to pay premiums and A&O paid the premiums only as they became due. Indeed, A&O commingled investor money in a general operating account that A&O used for paying its bills.[1] While A&O was operating, Allmendinger, Oncale, and Abdulwahab misappropriated millions of dollars from this account for their personal benefit.

---

[1]The payment of premiums was no small concern because, without such payment, policies would lapse, rendering the associated investments worthless.

The coconspirators also misrepresented A&O's size, staff, and record of earning returns for its investors. In 2005 and 2006, A&O's websites listed fictional people as company principals, falsely stated that A&O had offices in multiple states, greatly exaggerated the number of A&O employees, and falsely stated that A&O had particular legal and business professionals on its staff. The sites also stated in July 2005 that A&O had "enabled [its] clients to leverage $375 million into $800 million in less than five years," J.A. 120 (internal quotation marks omitted), when in actuality, no investor had received any pay out at that time and Abdulwahab had been informed of that fact. Abdulwahab assisted in creating the 2006 version of the website, and his business card listed the website address.

In 2006, Allmendinger and Oncale invited Abdulwahab, who was, at that point, responsible for 80-90% of A&O's sales, to become a partner. Thereafter, the three men each held an equal interest in A&O and shared authority over the company. Abdulwahab also was added as a signatory to A&O's bank accounts. HIC continued to market A&O's products, and A&O's commission payments to HIC remained unchanged.

By late 2006, regulators from different states began to send inquiries to A&O regarding its life settlement product, based largely on concerns that A&O was selling an unregistered security. These inquiries prompted the three partners to consult with Florida attorney Michael Lapat, who assisted A&O in setting up hedge funds that were backed by life settlements. By early 2007, A&O began offering fractionalized interests in these funds that they called "capital appreciation bonds."

The three partners agreed that Abdulwahab would serve as fund manager. In the course of drafting the necessary offering documents and disclosures, Lapat used information from a document that Abdulwahab had completed earlier in 2006 in connection with an unrelated hedge fund ("the 2006 docu-

ment"). Abdulwahab had falsely represented on that document that he had earned an economics degree from Louisiana State University when he had neither attended LSU nor obtained a college degree from any school. Abdulwahab had checked "no" in response to the question of whether he had "been convicted or pled guilty or nolo contendere, no contest . . . to a felony or misdemeanor involving investments or investment-related business, fraud, false statements or omissions, wrongful taking of property, bribery, forgery, counterfeiting or extortion." J.A. 262 (internal quotation marks omitted). He also had checked "no" in response to the question of whether "[he] or an organization of which [he] exercised management or policy control [had] ever been charged with any felony or charged with a misdemeanor" of the type described in the previous question. J.A. 262 (internal quotation marks omitted). In actuality, Abdulwahab had pled guilty in 2004 in Harris County, Texas, to the felony of forgery of a commercial instrument. The court that accepted Abdulwahab's guilty plea deferred a final adjudication in his case and placed him on a five-year period of community supervision. Indeed, Abdulwahab was serving that term when he completed the 2006 document.[2]

Lapat used the 2006 document to draft a biography and the A&O funds' disclosure documents, including the private offering memorandum ("POM"). In so doing, Lapat discussed particular language with Abdulwahab. Because the POM was based on the 2006 document, the POM stated that Abdulwahab had earned his degree from LSU and did not disclose his felony plea. Although A&O regularly paid commissions of more than 10% to its sales agents, the POM nonetheless stated that A&O would invest 95% of investor funds in accordance with its investment objectives.

---

[2]On June 4, 2007, the court terminated Abdulwahab's period of supervision early and dismissed the case.

After making the change to selling capital appreciation bonds, A&O continued to operate in much the same way that it had previously, including using HIC to sell the bonds. A&O also continued to perpetuate various misrepresentations by creating new marketing materials. For example, the three principals and co-conspirator Eric Kunz drafted a "History Sheet" for A&O stating again that Abdulwahab had earned his economics degree from LSU, and A&O mailed this document daily in 2007 to sales agents and investors. In fact, A&O regularly utilized the mail to send marketing materials and investor documents.

As things turned out, A&O's decision to sell capital appreciation bonds instead of life settlements did not stem the tide of regulator inquiries. For this reason and because of some tension among the partners, Allmendinger, Oncale, and Abdulwahab agreed to sell A&O to a company called "Blue Dymond." Before the sale, however, Allmendinger, Oncale, and Abdulwahab helped themselves — for what Allmendinger believed was one final time — to several hundred thousand dollars from A&O's operating fund. After this raid on A&O's coffers, only $2.9 million remained in A&O's bank accounts — not even half of the amount A&O needed to pay the premiums on all of its policies up through their bonding dates.

Abdulwahab was retained as a consultant for six months after the sale as part of the sales contract. However, although Allmendinger did not know it, Abdulwahab and Oncale had constructed an elaborate secret plan to purchase the company themselves and continue running it. Blue Dymond — the buyer of A&O — was little more than a front for Abdulwahab and Oncale; it was an offshore shell company created and funded by Abdulwahab and Oncale with the assistance of attorney Russell Mackert and without the knowledge of Allmendinger.

To fund the "sale," Oncale and Allmendinger each deposited $380,000 from their personal A&O disbursements into

Mackert's attorney trust account. Under the terms of the sale, the partners were to receive $750,000, with the expectation of an additional $250,000 in the 18 months following the sale. While Allmendinger received his $750,000 check, Oncale and Abdulwahab — unbeknownst to Allmendinger — each received checks in the amount of only $750 and secretly continued the business through Blue Dymond. Mackert wrote all three of these checks from his attorney trust account.

In September 2007, Mackert, at the direction of Abdulwahab and Oncale, also formed another offshore shell company, Physicians Trust, LLC, in the Caribbean Island of Nevis. This new company allegedly purchased Blue Dymond in order to further disguise Abdulwahab's and Oncale's involvement with A&O. That same month, Abdulwahab and Oncale hired David White to serve as A&O's president.

Through August 31, 2007, the date of the sale, Allmendinger had personally received $8,455,033.60 from A&O; Oncale had received $7,303,496.98; and Abdulwahab had received $2,889,366.70. With Allmendinger gone, A&O continued generally to operate in much the same manner as it had before. However, the remaining principals accelerated their misappropriation of investor funds. Indeed, after the sham sale, Abdulwahab and Oncale transferred approximately $10 million of investor funds from A&O's bank accounts to Mackert's attorney trust account, about $5.1 million of which was for Abdulwahab's benefit.

All told, A&O signed 843 investor contracts investing a total of $104,048,660.18 between 2004 and 2008. During that period, Abdulwahab personally received $8,002,904.78 from the scheme.

Mackert took over the management of the A&O entities in March 2008. A&O had stopped taking new investor funds by that time, and Mackert's role was essentially to make sure that premiums were paid, investor questions were answered, and

investor files and policy files were protected. The policy premiums were to be paid in part from $4.6 million that White had paid to Prestige Escrow Company. In March 2009, however, Mackert discovered that Prestige had stolen a large portion of that money. In the next two months, Mackert undertook to determine how much money would be needed to continue to pay the policy premiums. He concluded not only that there was not enough money after the theft but also that, even had the theft not occurred, the $4.6 million "wasn't even close" to being sufficient to pay the policy premiums. J.A. 522. With A&O lacking sufficient funds to make premium payments, Mackert subsequently placed A&O into bankruptcy.

On September 7, 2010, Allmendinger, Abdulwahab, and White, were indicted in the Eastern District of Virginia. On February 1, 2011, the grand jury returned a superseding indictment against the three men. Abdulwahab was charged with one count of mail fraud conspiracy, *see* 18 U.S.C. § 1349 (Count 1); six counts of mail fraud, *see* 18 U.S.C. § 1341 (Counts 2-7); one count of money laundering conspiracy, *see* 18 U.S.C. § 1956(h) (Count 8); six counts of money laundering, *see* 18 U.S.C. § 1956(a)(1)(A)(i) (Counts 9-14); and four counts of securities fraud, *see* 15 U.S.C. §§ 77q(a), 77x (Counts 15-18).[3] The superseding indictment charged that a purpose of the alleged mail fraud conspiracy was "to mislead investors regarding A&O's safekeeping and use of investor funds and the risks of A&O's investment offerings, in order to obtain investor funds so that the conspirators could personally profit." J.A. 43.

---

[3]After cooperating with the government, Oncale pleaded guilty pursuant to a plea agreement to one count of conspiracy to commit mail fraud and one count of conspiracy to commit money laundering. He received a sentence of 10 years' imprisonment. White pleaded guilty to a criminal information alleging conspiracy to commit mail fraud, money laundering, and securities fraud, and he was sentenced to five years' imprisonment.

After resolving several pretrial motions, the district court granted motions by Abdulwahab and Allmendinger to sever their respective trials.[4]

On the government's motion, the district court dismissed Counts 4, 10, and 16 of the superseding indictment as to Abdulwahab. *See* Fed. R. Crim. P. 48(a). At the close of the government's case, Abdulwahab moved for a judgment of acquittal on the remaining counts with the exception of Count 1 (conspiracy to commit mail fraud) and Count 8 (conspiracy to commit money laundering). *See* Fed. R. Crim. P. 29(a). Regarding the money laundering counts, Abdulwahab argued that the transactions identified in the indictment did not constitute money laundering because they were simply payment of commissions that had already been earned for sales of A&O products. The district court expressed some doubt as to whether the payment of the earned commissions was "money laundering as opposed to just evidence of the [underlying] fraud." J.A. 715. Nevertheless, the district court denied the motion as to those counts and as to the remaining charges as well. Abdulwahab then presented his case, which consisted only of his testimony. Afterwards, he unsuccessfully renewed his motion for judgment of acquittal. The jury found him guilty on all remaining counts.

Following his conviction, Abdulwahab moved unsuccessfully for a judgment of acquittal on each count of conviction or, in the alternative, for a new trial. *See* Fed. R. Crim. P.

---

[4]Allmendinger was subsequently convicted of one count of conspiracy to commit mail fraud, two counts of mail fraud, one count of conspiracy to commit money laundering, two counts of money laundering, and one count of securities fraud. He was sentenced to 540 months' imprisonment and ordered to pay restitution in the amount of $101,963,048.05. We affirmed his sentence on appeal. *See United States v. Allmendinger*, 706 F.3d 330, 340-44 (4th Cir. 2013). Mackert pleaded guilty to a criminal information alleging mail fraud conspiracy and bulk cash smuggling, *see* 31 U.S.C. § 5332, and received a sentence of 188 months' imprisonment.

29(c)(1), 33(a); *United States v. Abdulwahab*, 2011 WL 4434236 (E.D. Va. Sept. 22, 2011).

The court then turned to sentencing. Pursuant to an agreement reached by the parties, the court adopted the evidence from Allmendinger's earlier-conducted sentencing, and the parties also presented additional evidence. Included in that additional evidence was testimony from IRS Special Agent John Norton that, based on his review of bank records, investor listings, and bankruptcy records, investors lost at least $101,857,687.11 from May 26, 2005 — when the government contended Abdulwahab joined the conspiracy — until the scheme ended in January 2008. Acknowledging that $8,287,051.65 had been recovered through A&O's bankruptcy, the government argued that a loss of $93,570,635.46 was foreseeable and attributable to Abdulwahab. Abdulwahab argued for a much smaller loss amount for two reasons. First, he maintained that he did not join the conspiracy until he was made an equity partner of A&O on November 1, 2006, and thus should not be responsible for the loss of funds invested prior to that date. Second, he contended that he should not be responsible for the losses caused by Prestige Escrow Company's theft of A&O's $4.6 million or by the fact that several of PCI's bonds turned out to be fraudulent.

The district court rejected Abdulwahab's arguments and adopted the government's proposed loss amount. Regarding the scope of the activity Abdulwahab agreed to undertake, the court determined that he agreed "to secure funds from people by using fraudulent misrepresentations." J.A. 1432. The district court found that Abdulwahab "knew that the representations being used to induce these people to invest in A&O were false" and that he "helped create some of the false impressions himself." J.A. 1432-33. The court specifically noted Abdulwahab's misrepresentations about A&O's past record of success and its scope and his claims that he had invested money with A&O and that his clients had succeeded with A&O. The court noted that A&O was built on a series

of lies designed to make investors feel that their investment was risk-free, when in fact quite the contrary was true, as Abdulwahab well knew. The court determined that a person does not "have to be a partner to be a conspirator" and that Abdulwahab had joined the conspiracy by May 26, 2005, when he received his first commission payment. J.A. 1432.

Citing *United States v. Jimenez*, 513 F.3d 62 (3d Cir. 2008), the court determined that the fact that the investors' losses may have been partly the result of intervening causes concerning the misdeeds of Prestige Escrow Company or PCI would not affect the calculation of Abdulwahab's loss amount, although those actions could justify a downward variance from the advisory guideline range. In the end, the court concluded that Abdulwahab was responsible for all investor losses because they were reasonably foreseeable to Abdulwahab as a potential result of his scheme. The court reasoned that

> knowing the way that business was operated, [Abdulwahab] knew that they were basically robbing Peter to pay Paul, that, in fact, they were trying to pay premiums on policies as they came in, and it was reasonably foreseeable to him that if the premiums didn't come in or something happened to affect the business, the scheme would fall on its face as it did.

J.A. 1434.

Adopting the government's suggested loss amount of $93,570,635.46, the district court applied a 24-level increase for a loss exceeding $50 million. *See* U.S.S.G. § 2B1.1(b)(1)(M) (2010). Several other enhancements increased Abdulwahab's total offense level to 43.[5] This level,

---

[5]Although the total offense level was actually 45, an offense level exceeding 43 is treated as an offense level of 43 under the Guidelines. *See* U.S.S.G. Ch. 5, Pt. A, cmt. n.2.

combined with Abdulwahab's category III criminal history, yielded a guideline range of life imprisonment, capped by a statutory maximum of 3,060 months' imprisonment.

The district court stated that it was the "intention of the Court to impose a sentence of 60 years [720 months] imprisonment." J.A. 1450. In so doing, the court varied downward by 2,340 months from the guideline range of 3,060 months. The court decided to vary downward in that amount in part because the losses "were exacerbated by intervening events over which the defendant had no control," including the actions of Prestige Escrow and PCI. J.A. 1449. The court also ordered Abdulwahab to pay more than $100 million in restitution.

## II.

Abdulwahab argues that the district court erred in denying his motion for a judgment of acquittal as to several counts. We review de novo the denial of a motion for judgment of acquittal. *See United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). In considering a claim that the evidence was insufficient to support a conviction, we view the evidence in the light most favorable to the government and "sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Penniegraft*, 641 F.3d 566, 571 (4th Cir. 2011).

## A.

Abdulwahab first maintains that his money laundering convictions are barred by the "merger problem" identified in *United States v. Santos*, 553 U.S. 507, 517 (2008), since those convictions are based on allegations that he paid the expenses

of completed frauds with money that the frauds generated. We agree.[6]

In *Santos*, the Court considered whether the term "proceeds" in 18 U.S.C. § 1956(a)(1), the federal money-laundering statute, means "receipts" or "profits" for the particular crime there at issue. The crime at issue in that case was operating an illegal gambling operation, wherein the defendant employed a number of helpers. *See* 553 U.S. at 509. At bars and restaurants, the defendant's runners would gather bets, keep a portion of the bets as their commissions, and deliver the rest to the defendant's collectors. *See id.* The collectors then gave the money to the defendant, who used some of it to pay the salaries of collectors and to pay the winners.

---

[6]Abdulwahab argued to the district court in support of his Rule 29 motion regarding these counts that the transactions identified in the indictment did not constitute money laundering because they were simply payment of commissions that had already been earned for sales of A&O products. *See* J.A. 709 ("I submit that putting checks in the mail for commissions that were earned [is] not money laundering under the statute, within the intent of the statute."); J.A. 710 ("[T]hese are commissions that are earned from sales. Respective people are being paid, but it's not money laundering."). Indeed, before denying the motion as to these counts, the district court expressed some doubt as to whether the payment of the earned commissions was "money laundering as opposed to just evidence of the [underlying] fraud." J.A. 715. Although Abdulwahab could have explained in greater detail why he believed that the fact that the transactions in question were simply payments for earned commissions entitled him to a judgment of acquittal, we conclude that he did enough to preserve the issue, and we note that the government does not argue otherwise.

The district court instructed the jury that to show that money constituted "proceeds" of Abdulwahab's mail fraud, the government needed to prove only that the "money came from the mail fraud money." J.A. 991. Although Abdulwahab did not object to that instruction, the error he alleges on appeal is not an instructional error, but rather an error in denying his Rule 29 motion at the close of the government's case. In reviewing that claimed error, we apply the correct law regardless of whether it was charged by the district court. *See United States v. Perry*, 335 F.3d 316, 320 n.6 (4th Cir. 2003).

*See id.* Those payments to runners, collectors, and winners were the basis for the money laundering charges and convictions in that case. *See id.* at 510, 524. The district court vacated the money laundering convictions, however, on the basis that "the proceeds admittedly used by Santos to pay winners and couriers *could only have been gross* proceeds," as opposed to net proceeds. *United States v. Santos*, 342 F. Supp. 2d 781, 799 (N.D. Ind. 2004), *aff'd*, 461 F.3d 886 (7th Cir. 2006).

The Supreme Court affirmed in a 4-1-4 decision on the basis of a so-called "merger problem." *Santos*, 553 U.S. at 515 (internal quotation marks omitted). Writing for the plurality, Justice Scalia noted that if "proceeds" referred to "gross receipts," "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." *Id.* "Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would 'merge' with the money-laundering statute." *Id.* at 515-16. Justice Scalia also concluded that similar problems would arise "[f]or a host of predicate crimes." *Id.* at 516.

Representing the fifth vote for the Court's judgment, Justice Stevens agreed that specifically with respect to the gambling enterprise with which the defendants had been convicted in *Santos*, it was unclear whether Congress intended that "proceeds" would mean only profits or rather that it would include all receipts. *Id.* at 525-26 (Stevens, J., concurring). He concurred in the judgment only, finding that "[a]llowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy." *Id.* at 527 (Stevens, J., concurring).

In *United States v. Halstead*, 634 F.3d 270 (4th Cir. 2011), we considered the meaning of the *Santos* decision in a case

involving a healthcare fraud scheme. We began by noting that, in the case of a plurality opinion, the holding of the Court is the narrowest holding that garnered five votes. *See Halstead*, 634 F.3d at 277 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). As for what that holding was, we explained:

> [W]e read *Santos* to hold that when a merger problem arises in the context of money laundering and illegal gambling, the *required* solution is to define the proceeds of the illegal gambling business as its net profits. When, however, a merger problem arises in the context of money laundering and an illegal activity other than illegal gambling, because of Justice Stevens' opinion that would require addressing that situation on a case-by-case approach, we will leave further development of a solution to a future case that presents the problem.

634 F.3d at 279.

We then turned to the question of whether the case presented a merger problem. As the *Halstead* court explained, in the case of a money laundering statute criminalizing financial transactions involving the "proceeds" of an illegal activity, a merger problem can occur if a person is convicted "for paying the 'essential expenses of operating' the underlying crime." *Id.* (quoting *Santos*, 353 U.S. at 528).

In *Halstead*, Halstead engaged in a scheme in which insurance companies were fraudulently billed. *See id.* at 272-73. Once a clinic that had been opened at Halstead's direction received the payments, it transferred the money to another company Halstead had formed, which, in turn, transferred the money to checking accounts belonging to Halstead and his co-conspirator. *See id.* at 273. We found no merger problem on those facts, concluding that Halstead's fraud was complete once the insurance company made the payments. *See id.* at

280. Thus, the money received by the clinic constituted "proceeds" of the fraud, and there was no merger problem with money laundering convictions based on a transaction involving those proceeds. *See id.* at 280-81.

We had occasion again to apply *Santos* in *United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012). Cloud's scheme, at its essence, involved convincing people to invest in real estate properties that, unbeknownst to the buyers, Cloud had recently purchased for a lesser amount. *See id.* at 399-400. The scheme also involved falsification of loan applications and the payment of "thousands of dollars in kickbacks to buyers, at least one mortgage broker, and the recruiters responsible for finding the buyers." *Id.* at 400. Cloud was convicted of several crimes, including, as is relevant here, one count of conspiracy to commit money laundering and six counts of money laundering. *See id.* at 399. The substantive counts all concerned various payments Cloud made "to recruiters, buyers, and other coconspirators for the role each person played in the mortgage fraud scheme." *Id.* at 406. On appeal, we reversed those convictions, finding that they suffered from the merger problem identified in *Santos*. *See id.* at 408. We concluded that, unlike the payments in *Halstead*, the charged transactions were payment of "the essential expenses of the underlying fraud" because it was only through the promise of these payments that Cloud was able to persuade his coconspirators to do business with him.[7] *See id.* at 406-08. That the payments were made after the services were performed did nothing to change that. *See id.* at 408. In order to correct the merger problem, we defined "proceeds" as "profits," as the *Santos* Court had done, and reversed the money laundering convictions on that basis. *See id.* at 409.

---

[7]We noted that the same could not be said of the payments in *Halstead* since the transactions constituting money laundering were not payments for services rendered. *See United States v. Cloud*, 680 F.3d 396, 407 (4th Cir. 2010).

On the other hand, we found no merger problem with Cloud's conviction for conspiracy to commit money laundering because "[u]nlike Cloud's substantive money laundering charges, the conspiracy charge was not tied to any specific payment to a recruiter, buyer, or coconspirator" and "there was evidence that Cloud used the profits from his previous [illegal deals] to finance additional purchases." *Id.* at 408. Thus, we affirmed the conspiracy conviction. *See id.*

Abdulwahab's case creates a merger problem very similar to that present in *Cloud*. The money laundering counts at issue concerned commission payments to HIC sales agent Tim Bromseth. These payments, like those in *Cloud*, were for services that played a critical role in the underlying fraud scheme in that it was the promise of payment for services rendered that enticed HIC and Bromseth to obtain investors for A&O. As such, Abdulwahab was no different than "the felon who uses the stolen money to pay for the rented getaway car" or "the initial recipient of the wealth" in "any wealth-acquiring crime with multiple participants . . . [who] gives his confederates their shares." *Id.* at 404 (quoting *Santos*, 553 U.S. at 516). Unlike the transactions in *Halstead*, the commission payments were essential expenses of the illegal activity. Thus, the merger problem we identified in *Cloud* arises in this case as well, and, following *Cloud*, we correct it by defining "proceeds" as "net profits." *See id.* at 409. Under this definition, while payment of the commissions may have constituted evidence of the fraud underlying the money laundering charges, the payments did not constitute money laundering. We therefore hold that the district court erred in rejecting Abdulwahab's contrary argument and denying his motion for judgment of acquittal as to those counts.[8]

---

[8]After the Supreme Court decided *Santos*, Congress amended the money-laundering statute to specifically define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." Fraud Enforcement and Regulatory Act of 2009, Pub. L. No. 111–21, § 2(f)(1), 123 Stat. 1617, 1618 (2009) (codified at 18 U.S.C. § 1956(c)(9)). With "proceeds" now specifically defined, the issue we address today should not recur in many future cases. *See Cloud*, 680 F.3d at 409 n.6.

The government contends that our reversal of the money laundering convictions should not warrant a full resentencing since all of Abdulwahab's sentences for these counts were ordered to be served concurrently with the three consecutive 240-month sentences he received for Counts 1, 2, and 3. However, as the government concedes, the error is not harmless in light of the court's imposition of a separate special assessment for each count. *See Ray v. United States*, 481 U.S. 736, 737 (1987) (per curiam). On the facts before us, we believe a remand is appropriate so that the district court may consider whether the reversal of the money laundering convictions warrants any change in Abdulwahab's sentence.

B.

Abdulwahab argues that his conviction for conspiracy to commit money laundering suffers from the same merger problem as his convictions for substantive money laundering and thus that the district court erred in not granting his motion for judgment of acquittal on the conspiracy charge.

Because Abdulwahab did not raise this issue in the district court, we review it for plain error. *See United States v. Wallace*, 515 F.3d 327, 331-32 (4th Cir. 2008). To obtain relief under plain-error review, Abdulwahab must first establish that "the district court erred, that the error was plain, and that it affected his substantial rights." *United States v. Robinson*, 627 F.3d 941, 954 (4th Cir. 2010) (internal quotation marks and alterations omitted). "Even when this burden is met, we have discretion whether to recognize the error, and should not do so unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Hargrove*, 625 F.3d 170, 184 (4th Cir. 2010) (internal quotation marks omitted). Here, Abdulwahab cannot even establish error, let alone plain error.

Unlike the money laundering charges, the charge for conspiracy to commit money laundering "was not tied to any spe-

cific payment." *Cloud*, 680 F.3d at 408. We therefore consider whether the record contained evidence that could support the conviction. *See id.* Here, the government presented such evidence relating to the sham sale that Abdulwahab and Oncale orchestrated to allow them to continue with their scheme once Allmendinger ceased his involvement. In anticipation of the sale, Abdulwahab and Oncale each deposited into Mackert's client trust account $380,000 that they had taken from personal A&O disbursements, and they had Mackert write checks on this account in the amounts of $750,000 to Allmendinger and $750 each to Abdulwahab and Oncale. A rational jury certainly could have found that these transactions were intended to promote the continuation of the investment scheme after Allmendinger left, and thus that the agreement to execute this plan constituted a promotional money laundering conspiracy. *See* 18 U.S.C. § 1956(a)(1)(A)(i) (making it a crime for an individual, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity"). These transactions — at least the $750 payments — did not constitute paying expenses or giving coconspirators their shares of profits.[9] Rather, they were simply part of a deception that furthered Abdulwahab and Oncale's plan to continue their scheme to defraud investors once Allmendinger had departed. As such, there was no merger problem regarding these transactions.

## C.

Abdulwahab next maintains that the district court erred in denying his motion for judgment of acquittal regarding his

---

[9]In light of this conclusion, we need not determine whether the $750,000 payment to Allmendinger would also constitute money laundering.

convictions for conspiracy to commit mail fraud and for mail fraud and securities fraud. He specifically contends that the evidence was insufficient to prove that he knew of, and intended to participate in, a scheme to defraud. He also argues that he believed that he had no duty to disclose his criminal history to A&O's investors and that there was no evidence that his representation that he earned an economics degree from LSU was material to any investor's decision to invest.

"To obtain a conviction for mail fraud, the Government must prove (1) the existence of a scheme to defraud and (2) the use of the mails (or another interstate carrier) for the purpose of executing the scheme." *United States v. Delfino*, 510 F.3d 468, 471 (4th Cir. 2007). To obtain a conviction for securities fraud under 15 U.S.C. § 77q(a), the government must show that the defendant willfully offered to sell or actually sold a security through the mails, knowing that he was employing a statement containing either material misstatements or omissions of material fact. *See United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993).

As the district court concluded after the trial, the government presented "extensive evidence from which the jury could have concluded that [Abdulwahab] engaged in the scheme to defraud" regarding the mail fraud counts, as well as "ample evidence from which a rational jury could have concluded that [he] engaged in securities fraud." *Abdulwahab*, 2011 WL 4434236, at *2-3.

Evidence showed that Abdulwahab not only was aware of misrepresentations being used to lure in clients, but he was making such misrepresentations himself. Considering Abdulwahab's central role with A&O, a jury might have reasonably inferred that he knew of A&O's misrepresentations concerning its number of employees, its number of offices, its years of experience, and its record of success. Evidence also demonstrated Abdulwahab's willingness to lie about his own

involvement with A&O. For example, investor Wallace Bennett testified that Abdulwahab told him in the spring of 2005 that Abdulwahab had personally invested all of his investable assets in A&O life settlements and that he had several clients who had invested their funds, cashed out, and then reinvested those funds back into life settlements. In fact, evidence showed Abdulwahab had not invested one penny in life settlements and none of his clients had received payment on a life settlement investment.

Several witnesses also testified about Abdulwahab's role in creating and disseminating the so-called A&O History Sheet and the POM, both of which contained false information about Abdulwahab's educational background while failing to disclose his forgery plea. Abdulwahab argues that the government failed to show that whether he had earned an economics degree from LSU was material to investors' decisions to invest with A&O. As for the failure to disclose his felony plea, Abdulwahab does not contest the materiality of that omission, but he argues that his failure to disclose it was simply a good-faith error insofar as he believed that since the court accepting his plea deferred adjudication on his case, "it would be like it would no longer be there." J.A. 745. We need not address Abdulwahab's argument concerning the misrepresentations of his educational background because the jury certainly could have rationally concluded that any suggestion by him that he was acting in good faith by omitting his felony plea was belied by his representation, on the 2006 document, that he had never even been charged with a felony.

Additionally, extensive evidence documented Abdulwahab's involvement in the sham sales of A&O to Blue Dymond and Physicians Trust and in the transfer of millions of dollars to himself and Oncale. All of Oncale and Abdulwahab's efforts to hide their connection to, and control of, the business further demonstrated that the men were both well aware of their wrongdoing.

Simply put, as the district court noted, the evidence supporting Abdulwahab's various fraud convictions was strong and well beyond what was necessary to support his convictions. The district court was correct to deny his motion for a judgment of acquittal on these charges.

III.

Abdulwahab finally maintains that the district court erred in holding him responsible at sentencing for losses of funds that were invested with A&O before he became an equity partner. We disagree.[10]

"[T]he determination of loss attributable to a fraud scheme is a factual issue for resolution by the district court, and we review such a finding of fact only for clear error." *United States v. Godwin*, 272 F.3d 659, 671 (4th Cir. 2001). "The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). Because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon the evidence . . . , the court's loss determination is entitled to appropriate deference." *Id.* In the context of § 2B1.1, "loss is the greater of actual loss or intended loss," and "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A), n.3(A)(i). The term "reasonably foreseeable pecuniary harm" is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* cmt. n.3(A)(iv).

The district court found that Abdulwahab and his coconspirators agreed to make false representations to investors in order to induce them to invest their money with A&O. The district court explained that these lies included misrepresenta-

---

[10]Although we vacate Abdulwahab's sentence in light of our reversal of the money laundering convictions, we address this issue in this appeal for the sake of judicial efficiency.

tions concerning A&O's size, the number of people it employed and number of its offices, the prior investment success of its products, and the way A&O used the funds it received from investors. Rejecting Abdulwahab's argument that he did not join the conspiracy until he became an equity partner in A&O, the court found that Abdulwahab joined no later than May 26, 2005, when HIC received its first A&O commission payment.

Abdulwahab contends that the district court clearly erred in finding that he joined the conspiracy before becoming an equity partner because even if he "suspected that portions of the marketing information provided by Allmendinger and Oncale were erroneous," his marketing of their products did not amount to participation in a conspiracy. Appellant's brief at 25. This argument simply fails to come to terms with the fact that the district court found that by May 26, 2005, Abdulwahab did not simply *suspect* that A&O was obtaining investors' funds by fraud, but that he *knew* they were, and he was acting in concert with them to help them do it. *See United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993) (noting that "the critical inquiry" regarding whether a conspiracy has occurred "concerns whether the Government proved agreement between at least two persons to concerted action" (internal quotation marks omitted)). The district court did not clearly err in its selection of the May 26, 2005, date.[11]

_____

[11]Abdulwahab also maintains that the district court erred in refusing to reduce his loss amount based on a purported intervening cause of the investor's losses, namely, that Prestige Escrow Company allegedly misappropriated certain investor funds independently of the A&O fraud. This argument fails, however, for the same reason we held in Allmendinger's appeal of his sentence that the district court did not err in refusing to reduce Allmendinger's loss based on the fact that PCI's bonds turned out to be fraudulent. *See Allmendinger*, 706 F.3d at 342-43.

## IV.

In sum, we reverse Abdulwahab's money laundering convictions but affirm the remainder of his convictions. Although we find no error in Abdulwahab's sentence, in light of our reversal of the money laundering convictions, we vacate his sentence and remand for resentencing.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*VACATED IN PART,*
*AND REMANDED*